**HUDSON WATERWAYS CORPORATION**

v.

**COASTAL MARINE SERVICE, INC.**

No. B–74–226–CA.

United States District Court, E. D. Texas, Beaumont Division.

June 30, 1977.

F. L. Benckenstein, Benckenstein, McNicholas, Oxford, Radford & Johnson, Beaumont, Tex., for plaintiff.

Timothy E. McKenna, Ross, Griggs & Harrison, Houston, Tex., for defendant.

## MEMORANDUM OPINION

STEGER, District Judge.

This is a suit in admiralty in which the Plaintiff, Hudson Waterways Corporation, seeks indemnity and/or contribution from the Defendant, Coastal Marine Service, Inc., for moneys paid by the Plaintiff in settlement of a claim filed by an injured seaman who was in the Plaintiff's employment.

In June of 1972, the Defendant was engaged in repair work aboard the SS TRANSHURON, a vessel owned and operated by the Plaintiff. This repair work was being done at the Defendant's shipyard located on the Neches River near Port Neches, Texas. The SS TRANSHURON was moored to a work barge or floating dock owned by the Defendant, and the work barge was moored to the shore of the Defendant's yard. In order to get from the TRANSHURON to the shore, one had to descend the ship's gangplank to the work barge, walk across the work barge, and then walk down a ramp to the shore.

On or about June 14, 1972, Leonardus Behm, a seaman who had signed foreign articles with the SS TRANSHURON, started to leave the TRANSHURON and go ashore. As seaman Behm descended the gangplank or ramp that ran from the Defendant's floating barge to the shore, he slipped and fell. Mr. Behm suffered a broken rib and a broken arm as a result of the fall and was required to spend more than a week in the hospital. He was unfit for duty for about three months after the fall, and after he became fit for duty, he could no longer work on oceangoing vessels.

The evidence in the case shows that the ramp on which Mr. Behm fell had mud on it

and was slippery. The evidence further shows that there were no cleats or hand rails on the ramp to assist a person ascending or descending the ramp.

Mr. Behm subsequently filed a Jones Act [1] suit against Hudson Waterways Corporation in the United States District Court for the Eastern District of Pennsylvania, Philadelphia Division. The Complaint alleged negligence on the part of Hudson Waterways and that the vessel was unseaworthy. The seaman asked for $250,000.00 in damages.

Hudson Waterways notified Coastal Marine Service, Inc. on several occasions of the pendency of seaman Behm's suit in Pennsylvania, and invited Coastal Marine to join in the defense of the suit. Coastal Marine did not join in that suit and Hudson Waterways settled the suit with seaman Behm for $18,703.92. This sum represented $16,500.00 for personal injuries, $903.92 for unearned wages, and $1,300.00 for maintenance.

In the present suit, Hudson Waterways asks that Coastal Marine be required, through the principles of indemnity or contribution, to reimburse it for the amount it paid in settlement of seaman Behm's claim. According to the Plaintiff, it was the responsibility of the Defendant to provide a safe means of ingress and egress to and from the ship while the vessel was moored at the Defendant's yard for repairs. The Plaintiff contends that the Defendant negligently failed to provide this safe means of ingress and egress, and this negligence was the proximate cause of Behm's injuries.

The Defendant denies that it is liable to the Plaintiff for any of the money it paid in settlement of the case. The Defendant contends that it had no duty to the Plaintiff or to the injured seaman to maintain a safe passageway from ship to shore. The De-

fendant further contends that the settlement with seaman Behm was not reasonable, and the Plaintiff cannot recover for any amounts paid to Behm for maintenance and wages. Finally, the Defendant's main contention, and its main defense to this suit, is that the contract for repair between the Plaintiff and Defendant insulated the Defendant from any liability to the Plaintiff, even liability for the Defendant's own negligence.

## I.

In order to establish its entitlement to indemnity, the Plaintiff must first show that an indemnitor-indemnitee relationship existed between Defendant Coastal Marine and itself.

An indemnity claim in admiralty may be based on either contract or tort concepts. The contract concept is the often-used doctrine of *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), i. e., breach of warranty of workmanlike performance.[2] The tort concept is based on the common law principles of "active" and "passive" negligence. *See e. g., Tri-State Oil Tool Indus. Inc. v. Delta Marine Drill. Co.*, 5 Cir., 410 F.2d 178 (1969). The Court determines that under both of these approaches, the Plaintiff is entitled to indemnity from the Defendant unless the release of liability clause found in the contract insulates the Defendant from liability.

### A. Contractual Indemnity

The *Ryan* doctrine is applicable to those situations in which there is a contract to perform services aboard ship. The *Ryan* case involved a longshoreman who was injured while working aboard a ship. The doctrine has been extended to cover situations such as this where a shore based con-

---

1. 46 U.S.C. § 688.

2. The Court notes that under the 1972 amendments to the Longshoremen's and Harbor Worker's Act, 33 U.S.C.A. 901 et seq., the *Ryan* doctrine in its original form, has been abolished. However, the amendments do not affect this action, since Leonardus Behm was a Jones

Act seaman, not a longshoreman or harbor worker in the employment of Coastal Marine Services, Inc. Coastal Marine carried no workmen's compensation insurance on Mr. Behm. See, *Hurdich v. Eastmount Shipping Corp.*, 2 Cir., 503 F.2d 397.

tractor is engaged in repair or maintenance services aboard a ship.[3] The basis for the doctrine is the warranty of workmanlike performance, which consists of the contractual obligation to perform duties under a contract with reasonable safety.[4]

In order to determine if contractual indemnity should be allowed, the Court must evaluate the conduct of both parties to determine:

"(1) Whether the warranty of workmanlike performance was breached; (2) whether that breach proximately caused the injury; and (3) whether the shipowner's conduct prevented the workmanlike performance." [5]

The Court finds that the Defendant breached its warranty of workmanlike performance by allowing the ramp which extended from its work barge to shore to become slippery with mud, and providing no hand rails or cleats to aid one traversing the ramp. The Court is of the opinion, based on pictures of the ramp and the testimony in the case, that the ramp was not safe, and a reasonably prudent contractor would not have allowed the ramp to be used in the condition in which it was. The Court concludes that the Defendant Coastal Marine was negligent in supplying the ramp in question as the means of ingress and the ramp was not reasonably safe and fit for its intended use.[6]

The Court is mindful that most of the cases in which the *Ryan* doctrine is applied deal with injuries that occur on board ship, and the breach of the warranty of workmanlike performance involves some action or inaction that occurs aboard ship or the failure of some piece of equipment located on board ship. However, the Court is of the opinion that it is of no consequence in the instant case that the ramp in question was not located on board the ship. The

Defendant does not contend otherwise. The ramp provided the means of ingress and egress to and from the ship, and getting to and from the ship was an integral part of the repair and maintenance work being done on the ship. The essence of the contractor's warranty of workmanlike performance is to perform its work "properly and safely." The Court concludes that in providing a defective ramp over which persons, including the contractor's own employees, must pass to go aboard and leave the ship, the contractor failed to perform its work "properly and safely."

The issue of proximate cause is a relatively simple one in this case. The great bulk of the evidence is to the effect that Behm slipped on the ramp because it had mud on it, making it slippery. The Court concludes that the dangerous and unsafe ramp provided by the Defendant was the proximate cause of Behm's fall and resulting injuries.

The Court is further of the opinion that no conduct on the part of the shipowner prevented the Defendant from rendering a workmanlike performance. The ramp in question was provided by the Defendant, and it ran from the Defendant's work barge to the Defendant's shipyard. The Defendant asserts that the Plaintiff's Port Engineer could have had the ramp repaired or altered in any manner, and that he never did. The Court is of the opinion that the Plaintiff's failure to object to an unsafe ramp provided by the Defendant did not prevent the Defendant's workmanlike performance, even though it might have amounted to negligence on the part of the ship.

Based on the above consideration, the Court is of the opinion that the Defendant has breached the warranty of workmanlike performance which it owed to the Plaintiff.

---

3. *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296 (5th Cir. 1973); *H & H Ship Service Co. v. Weyerhauser Line*, 382 F.2d 711 (9th Cir. 1967); M. Norris, *The Law of Maritime Personal Injuries*, Vol. 2 § 324 (3d ed. 1975).

4. *Garner v. Cities Service Tankers Corporation*, 456 F.2d 476 (5th Cir. 1972).

5. Ibid.

6. *Italia Soc. v. Or. Stevedoring Co.*, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1963).

### B. Tort Indemnity

In *Tri-State Oil Tool Indus., Inc. v. Delta Marine Drill. Co.*, 410 F.2d 178 (5th Cir. 1969), the Court observed that the *Ryan* case, allowing indemnity on a contractual basis, did not abrogate the right of a party to recover indemnity on a noncontractual basis. In an excellent discussion, the Court reviewed both pre-*Ryan* and post-*Ryan* cases, and concluded the cases subsequent to *Ryan* show that indemnity on a noncontractual basis continues to be recognized in maritime cases. 410 F.2d at 178–179.

■ The tort indemnity principle applied in maritime cases is that between two joint tort-feasors, the passively or secondarily negligent party may recover indemnity from the actively or primarily negligent party. *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296 (5th Cir. 1973).

■ In the present case, the Court finds that the negligence of the Plaintiff was in fact only passive and secondary, while the negligence of the Defendant was active and primary. This determination of the Court is based on the fact that Defendant Coastal Marine is the one who provided the ramp as a means of ingress and egress. The ramp belonged to Coastal Marine, and it was Coastal Marine who altered the ramp by placing a sheet of expanded metal down its center. The only negligence on the part of the Plaintiff that the Defendant asserts is the failure of the Plaintiff's Port Engineer to object to the ramp and request a safer one. The Court concludes that this is passive and secondary negligence.

A case quite similar to the present one is *Standard Oil Co. v. Robins Dry Dock & Repair Co.*, 32 F.2d 182 (2d Cir. 1929). In the *Robins* case, a ship owned by the plaintiff was being repaired by the defendant contractor at the defendant's dry dock. A seaman employed by the plaintiff slipped on a gangplank running from the edge of the drydock to the ship. The gangplank in question was owned and possessed by the defendant contractor. A judgment was rendered against the plaintiff in a suit by

the seaman. In a subsequent suit between the plaintiff and the defendant, the Second Circuit held that the installation of the defective gangplank involved active negligence on the part of the defendant, whereas the neglect of the plaintiff in failing to inspect the gangway and warn its employees against danger involved the secondary fault of omission. The Court held that under these circumstances, the shipowner was entitled to indemnity. 32 F.2d at 184. This case was cited with apparent approval in *Tri-State Oil Tool Indus. v. Delta Marine Drill. Co.*, 410 F.2d 178 (5th Cir. 1969). The Court is of the opinion that the principles stated in the *Robins* case are applicable here, and the Plaintiff is entitled to indemnity under the tort concept unless indemnity is prevented by the release of liability clause.

### II.

■ The Defendant has also asserted as a bar to recovery by the Plaintiff the allegation that it had no duty to maintain a passageway for the vessel's crew. This assertion of no duty requires a different approach in the tort and the contract concept of indemnity.

Under the *Ryan* doctrine, the Defendant is under a duty to perform its work in a reasonably safe manner.[7] The Defendant's assertion of no duty here presents the issue of whether the unsafe ramp in question falls within the warranty of workmanlike performance. The Court concludes that it does.

As stated earlier, the means of getting to and from the ship is an integral and essential part of the work being done on board the ship. If the contractor, through his negligence, causes liability to the shipowner by providing an unsafe passageway to and from the ship, this Court is of the opinion that the warranty of workmanlike performance has been breached.

Under the tort approach to indemnity, the Court is of the opinion that the allegations of no duty are answered by the opin-

---

7. *Garner v. Cities Service Tankers Corp.*, 456 F.2d 476 (5th Cir. 1972).

ion in *Watz v. Zapata Off-Shore Company*, 431 F.2d 100 (5th Cir. 1970), wherein the Court approved the adoption into admiralty of the *Palsgraf* [8] approach to duty. One who puts up a ramp as the means of getting to and from a ship must be held to know that seamen employed by the ship will use the ramp, and the Court concludes that Behm was within the scope of the risk of Coastal Marine's conduct.

## III.

The Plaintiff's request for indemnity is further complicated by the fact that it reached a settlement of its suit with seaman Behm, rather than allowing the case to go to judgment. In settlement cases such as this, the party seeking indemnity has the special problem of showing that his disposition of the indemnitor's funds has not contravened equitable indemnity principles.[9] These principles require that the indemnitee show its potential liability to the original plaintiff, or, under certain circumstances, a showing of actual liability may be required.[10]

If the indemnitee offers to the indemnitor, before any settlement is concluded, the choice of approving the settlement or taking over the defense of the case and agreeing to hold the indemnitee harmless in any event for damages which may be assessed against him in excess of the amount of the proposed settlement, and the indemnitor declines to take either course, then the indemnitee will only be required to show potential liability to the original Plaintiff in order to support his claim over against the indemnitor.[11] Further, the indemnitee must show that the settlement was reasonable in amount.

However, as stated earlier, the Court concludes that Hudson Waterways, the owner of the ship, has demonstrated actual liability to seaman Behm for his injuries. The facts surrounding Behm's accident are virtually uncontroverted. Seaman Behm slipped on a ramp extending from Hudson's floating barge to the shore. Behm was attempting to go ashore from the ship when the accident occurred. At the time of the occurrence, seaman Behm had signed his Articles. The ramp on which the seaman slipped was undisputed to be the customary route used by persons seeking to come on board or leave the ship. The Court finds that Behm slipped because the ramp was slippery with mud. The Court further finds that Behm was not negligent, and his actions did not contribute to his fall.

The Court is of the Opinion that a ship is liable for its negligence in failing to provide a safe means for its seamen to get from ship to shore, and the fact that the injury did not occur aboard ship does not prevent a recovery under the Jones Act by a seaman. *Magnolia Towing v. Pace*, 378 F.2d 12 (5th Cir. 1967); *Vincent v. Harvey Well Service*, 441 F.2d 146 (5th Cir. 1971); *Superior Oil Company v. Trahan*, 322 F.2d 234 (5th Cir. 1963). The Court is of the opinion that Behm, at the time of his injury, was acting within the scope of his employment as he moved from ship to shore. Therefore, Hudson Waterways is liable to Behm in this suit brought under the Jones Act. The vessel had a duty to provide a safe means of ingress and egress, and this duty was breached.

## IV.

The Defendant's main defense to this suit is the presence of the so-called "red letter clause" in the contract for repair between the Plaintiff and the Defendant. The pertinent provision of the contract reads as follows:

> Furthermore, we undertake to perform work and or provide public or private berth, wharfage, towage and other services and facilities only upon condition that we shall not be liable in any respect

8. *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928).

9. *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296 (5th Cir. 1973).

10. Ibid.

11. Ibid.

to or by any vessel, job or individual person, directly or indirectly in contract, tort, or otherwise, to its owners charterers, underwriters, etc. for any injury, loss, or damage to or by such vessel, its cargo, equipment, movable stores, or person or for any consequences thereto.[12]

According to the Defendant, this clause in the contract insulates it from any liability to the Plaintiff.

The Plaintiff contends that this clause is void and of no effect. The Plaintiff is of the opinion that Texas law controls the issue, and the clause is not sufficient to conform to the standards required by Texas law. The Plaintiff also asserts that the clause is void in admiralty and is against public policy. The Plaintiff further appears to contend that it had no actual notice of the contents of the clause, and therefore they should not be bound by it.

■ The question of the validity of the release of liability clause is governed by admiralty law. A contract to repair a vessel is maritime, and federal maritime law controls the point. *Alcoa Steamship Company v. Charles Ferran & Company,* 383 F.2d 46 (5th Cir. 1967); *A/S J. Ludwig Mowinckels R. v. Commercial Steve. Co.,* 256 F.2d 227 (2d Cir. 1958).

■ The evidence in the case is that the written document which constitutes the contract for repair was not sent to the Plaintiff until some time after the repair work was completed. However, the Court is of the opinion that the Plaintiff was on full notice that the clause was implied in every repair contract between the Plaintiff and the Defendant. This is because the custom in ship repair industry is to first do the repair work, and then send out the invoice which contains on it the contract. Between 1970 and 1975, the Defendant did 102 separate repair jobs for the Plaintiff. For each of these jobs, the invoice and contract were sent to the Plaintiff after the work was completed, and it contained the

---

**12.** The full text of the contract reads as follows:

We contract only upon the following terms, applicable to every contract: All prices quoted, are for immediate acceptance, all bills due and payable within 30 days in Port Arthur, Jefferson County, Texas. In the case of a vessel or company: In lieu of immediate payment, the invoice will become the preferred first mortgage against the vessel personally guaranteed by Owners, Agents, Charters, Operators, or Stockholders. Unpaid bills will bear interest at 10%. Any and all cost incurred to recover this debt will be added to the bill. All contracts, work orders or verbal instructions are subject, without responsibility on our part, for first, second or third person injuries, damage or delay in case of strike or labor difficulties, accidents, equipment failure, fire, explosion, etc. Liability in case of defective workmanship or material is limited only to the proper replacement by us thereof, any and all claims must be in our hands in writing within 30 days after work is completed. We are not responsible for any cargo, equipment, material, parts, etc. consigned, handled, stowed, shipped, or altered by us aboard vessel or ashore. Furthermore, we undertake to perform work and/or provide public or private berth, wharfage, towage and other services and facilities only upon condition that we shall not be liable in any respect to or by any vessel, job or individual person, directly or indirectly in contract, tort, or otherwise, to its owners, charterers, underwriters, etc. for any injury, loss, or damage to or by such vessel, its cargo, equipment, movable stores, or person or for any consequences thereto. In connection with an accident and/or indemnity and/or insurance clauses, if any, contained in your specifications, relating to liability to personal injuries, including death, or for damage to property of first, second or third parties, please note that we do not agree to same in so far a they undertake to impose any liability or any obligations to take out or maintain insurance beyond the combined total liabilities not to exceed the sum of $300,000. Any clauses in Customer's instructions or specifications which seek to alter or add to the foregoing in any respect will not be accepted. Additional liabilities will be assumed by us upon request if any agreement in writing stating the extent of such liabilities as entered into between the owners of the vessel and our insurance brokers before the vessel enters our yard or is made available elsewhere for our work and an appropriate adjustment made in the price. It is the responsibility of the person, an authorized direct agent, putting this work in hand, to notify all concerned of this clause and by putting work in hand signifies all concerned have been notified and all are in agreement, and obligated to, write detailed specifications and settle prices before the vessel leaves.

"red-letter" clause which the Plaintiff now contends is void. The Court believes this is sufficient to put the Plaintiff on full notice that this clause was implied in every repair contract. *Alcoa Steamship Company v. Charles Ferran & Company,* 383 F.2d 46 (5th Cir. 1967).

Since the Court has found that the clause was a part of contract, the Defendant is immune from liability unless the clause is too vague to be enforced, or unless the clause is void as against public policy.

 Immunity from liability for one's own negligence "can arise only from the plainly expressed intention of the parties, manifested by language couched in unmistakable terms . . ." *Lanasse v. Travelers Insurance Co.,* 450 F.2d 580, 584 (5th Cir. 1971); *Dow Chemical Company v. Dixie Carriers, Inc.,* 463 F.2d 120 (5th Cir. 1972). Thus the Court must examine the language of the contract in the light of the surrounding circumstances to see if it manifests an intention on the part of the parties that Defendant is not to be held liable, even for its own negligence. *Hennigan v. Chargers Football Company,* 431 F.2d 308 (5th Cir. 1970). It is the objective intention of the parties, not the subjective intention, that the Court must ascertain. *Hennigan v. Chargers Football Company, supra* ; P. Conway, *Outline of the Law of Contracts* Chapter 11 §§ 1 and 2 (3d ed. 1968). The language of the contract must be viewed from the standpoint of the parties, their relative freedom of action and real bargaining strength. *United States v. Seckinger,* 408 F.2d 146 (5th Cir. 1969).

 The language of the contract states that ". . . we undertake to perform work . . . only upon condition that we shall not be liable in any respect to or by any vessel, . . . or individual person, directly or indirectly, in contract, tort or otherwise, to its owners, charterers, underwriters, etc., for any injury, loss or damage to or by such vessel, . . . or person or for any consequences thereto." In the Court's opinion, this clause in the contract unequivocally states that the Defendant is not to be held liable by the Plaintiff, even

for the Defendant's own negligence. The language in the contract is strong. It states that the Defendant undertakes to perform work only upon the condition that the Defendant *will not be held liable in any respect,* for *any injury, loss, or damage,* to the vessel or its owners. If the Defendant is required to indemnify the Plaintiff in this situation where the Defendant has been negligent, it obviously *will have been held liable to the Plaintiff,* and this would run directly against the terms of the contract.

In summary, the contract states that the Defendant is not to be held liable to the Plaintiff in any respect, for any injury, and the Court believes that this language means that the parties contracted away the Defendant's liability to the Plaintiff, even for the Defendant's own negligence.

 Turning to the public policy question, the Court observes initially that it should be a basic policy of the law to hold parties to the contracts they make. The business and industry of the country function because contracts are binding and are enforced by the Courts. It is only when there is some overriding reason for public concern, some real and valid problem, that a party should be allowed to evade the terms of a contract he has agreed to. Of course, if the contract does in some way cause real harm to the public, then the Court should not hesitate to refrain from enforcing it.

 The Plaintiff has vigorously asserted that this release of liability clause is against public policy and should not be enforced, but most of the cases cited by the Plaintiff in support of this assertion are towage cases. Towage cases stand in a unique position in the law of admiralty. The Supreme Court held in *Bisso v. Inland Waterways Corp.,* 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), that a towboat could not contract away all liability for its own negligent acts. The Court stated that the two reasons for this rule were (1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive

hard bargains. The Court noted that the dangers of modern machines made it important that negligence be discouraged, and further, the large amount of maritime traffic made it important that vessels in American ports be able to obtain towage free of monopolistic compulsions. The Court illustrated the practical results of leaving towers free to contract away liability for their own negligence by referring to an English case, *The President Van Buren,* 16 Aspinall's Maritime Cases (N.S.) 444, which demonstrates the monopoly potential of the towing business.

It appears to the Court that the *Bisso* decision, which held that release of liability clauses in towage contracts were void, was based on the particular characteristics of the towing industry, and the Supreme Court did not make a determination that release of liability clauses were against public policy and void in all contracts concerning admiralty matters.[13]

The reasons behind the decision in the *Bisso* case are not present in this suit.

The Plaintiff was not overreached by the Defendant in any manner, and the contract entered into between the parties was in no way an adhesion contract. The contract itself provides that "Additional liabilities will be assumed by us upon request . . and an appropriate adjustment made in the price." The Plaintiff could therefore have negotiated with the Defendant and had the release of liability clause excluded from the contract for an increased price.[14] The Defendant's president testified that on previous occasions they had eliminated the release of liability clause when requested to do so and charged an increased price. In the Court's view, this demonstrates that there was no overreaching on the part of the Defendant. The parties were in an equal bargaining position. Further, there is no indication that there is any possibility

of a ship repair contractor, such as the Defendant, gaining a monopolistic position in the ship repair industry. Thus the possibilities of overreaching and the dangers of American shipping being subjected to monopolistic compulsions, which the Supreme Court gave great weight to in the *Bisso* case, are not present here.

The other reason for the *Bisso* decision, to wit, that those who have contracted away liability for their negligence will have a tendency to be more negligent, is also absent from this factual situation. The Defendant here did not contract away all of its potential liability for negligent acts. The contract in question affected only the Defendant's liability vis a vis the Plaintiff. The contract did not, and could not, affect the rights of any third parties. Indeed the Defendant was liable here to seaman Behm, under the facts found by the Court, and seaman Behm could have sued the Defendant and recovered. This potential liability, to everyone other than the Plaintiff, for its negligent acts was a sufficient incentive for the Defendant to conform its conduct to that of the proverbial "reasonably prudent man." This conclusion is supported by the fact that, as previously stated, from 1970 to 1975, the Defendant did 102 different jobs for the Plaintiff, and in each case the Defendant was insulated from liability to the Plaintiff for negligence; but there is no indication that the Defendant was ever negligent, or that the Plaintiff was ever displeased with the way the work was performed.

In addition, the Court is somewhat skeptical that elimination of the release of liability clause would have caused the Defendant to be more careful in its operation. As pointed out by the Defendant in its brief, if the clause were eliminated, the Defendant would simply adjust its insurance program so that it covered its negligence liability, and raise its prices to cover any increase in

---

**13.** It appears that even in towing cases, the *Bisso* decision has begun to receive a somewhat restrictive application, *see e. g., Twenty Grand Offshore, Inc. v. West India Carriers, Inc.,* 492 F.2d 679 (5th Cir. 1974).

**14.** In the Court's view, it would be quite inequitable to strike the release of liability clause down and hold the Defendant liable to the Plaintiff here when the Plaintiff has had the advantage of those lower prices for the 20 years it has been doing business with the Defendant.

premiums. The Defendant would actually have no more exposure to direct liability if the red letter clause were eliminated, as long as its insurance coverage remained in effect. The Court fails to see how, in this factual context, the Defendant would have a greater incentive to conduct its operation in more prudent manner if the clause in question were eliminated.

Although the Court has found no cases in point, there are indications that these release of liability clauses would not be held void as against public policy in admiralty law.

In *United States v. Seckinger,* 408 F.2d 146 (5th Cir. 1969), *rev'd on other grounds,* 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224, Chief Judge Brown, in analyzing a similar problem, stated in the Court's opinion,

> . . . we would certainly not consider for a moment in fashioning Federal law, that a contract to indemnify one against the consequences of the indemnitee's own negligence is contrary to public policy and thus void altogether, even though there is some division among the courts.[15]

The Court went on to quote from American Jurisprudence 2d what is considered to be the "general" rule,

> . . . a contract may validly provide for the indemnification of one against, or relieve him from liability for his own future acts of negligence provided the indemnity against such negligence is made unequivocally clear in the contract.[16]

In the *Seckinger* case, the Court was considering the problem of whether an indemnity agreement obligated the indemnitor to indemnify the indemnitee for losses caused by the indemnitee's own negligence. Judge Brown there expressly rejected the proposition that such contracts were contrary to public policy. In the opinion of this Court, if contracts such as the one involved in the *Seckinger* case are not violative of public policy, then the release of liability clause

found in the contract in the instant suit is not contrary to public policy. The public policy argument against both contracts would be almost identical.

The rule stated in the *Seckinger* case concerning indemnity agreements have also been stated and followed in *Transcontinental Gas Pipe L. Corp. v. Mobile Drill. Barge,* 424 F.2d 684 (5th Cir. 1970), and *Batson-Cook Company v. Industrial Steel Erectors,*[17] 257 F.2d 410 (5th Cir. 1958). The Court believes that these rules which pertain to indemnifying one against the consequences of one's own negligence are controlling in considering a clause which releases one from liability for his own negligence.

In summary, the Court holds that the contract between the parties released the Defendant from all liability to the Plaintiff and the Plaintiff is not entitled to receive any indemnity or contribution from the Defendant. The parties must lie in the bed that they themselves made.

Any finding of fact heretofore made which constitutes a conclusion of law is hereby adopted as a conclusion of law and any conclusion of law which is a finding of fact is hereby adopted as a finding of fact.

---

15. 408 F.2d at 150.

16. Id. at 150 n.9.

17. The *Batson-Cook* case contains an excellent listing of the authorities in the area at footnote 3, p. 412.