196 F.Supp.2d 914 (2002)
In the Matter of THE COMPLAINT, OF Ronald and Marth JESSUP FOR EXONERATION FROM, OR LIMITATION OF, LIABILITY.
No. 4:99-CV-112 SNL.
United States District Court, E.D. Missouri, Eastern Division.
January 8, 2002.
James K. Mondl, Tonkin & Mondl, St. Louis, MO, for Ronald and Martha Jessup.
Russell F. Watters, Managing Principle, Brown & James, PC, St. Louis, MO, Angela N. Loehr, Gallop & Johnson, Clayton, MO, for Claimants.
John R. Halpern, Teresa McNail, Derrick Shane Kirby, Goldstein & Price, LC, St. Louis, MO, for Yacht Club of St. Louis.

MEMORANDUM OPINION
LIMBAUGH, Senior District Judge.
This case arises out of a fire which erupted on the M/V A-OK while docked at the Yacht Club of St. Louis, located in St. Charles, Missouri, on the Mississippi River. The fire engulfed the M/V A-OK and *915 spread to some structures at the marina and other vessels including the M/V My Prerogative, the M/V Lady Ellen, and the M/V Never Better. Ronald and Martha Jessup, owners of the M/V A-OK, filed this cause of action for exoneration from, or limitation of, liability for all claims arising from the incident. Ivy and Ruby Smith, owners of M/V My Prerogative, Lawson and Mary Burford, owners of M/V Lady Ellen, Joseph and Barbra Sander, owners of M/V Never Better, and the Yacht Club of St. Louis all made claims.[1] The Smiths and the Burfords then filed a Third Party Complaint against the Yacht Club of St. Louis, and the Sanders filed a Crossclaim against the Yacht Club. The Jessups then filed a Counterclaim against the Yacht Club seeking indemnification in the event they were found liable. In simpler terms, all the vessel owners have filed claims against the Jessups and the Yacht Club, and the Jessups and the Yacht Club have filed claims against each other.
This case was tried before the Court sitting without a jury on November 13-17, 2000, and counsel for parties were present. At the conclusion of trial, all parties made oral motions for judgment as a matter of law. These motions were taken with the case. After careful consideration of all objections to exhibits taken with the case, all said objections are hereby overruled, and all exhibits offered into evidence at trial are received into evidence. However, the Court would like to note, that although this evidence was admitted, the Court did not base its decision on any of the evidence to which objections were lodged.
In addition, the Yacht Club had filed a motion in limine to exclude opinion testimony of James Manley, and the Jessups filed a motion in limine to exclude certain testimony of the Yacht Club's experts. On September 20, 2001, the Court issued an order granting in part and denying in part both of the motions in limine. In that Order the Court indicated that it would explain which part of the experts' testimonies would be admitted, and which would not in this opinion. Upon further review, the Court finds that it does need to give a detailed explanation, because the portions of testimony which are admissible, were not pertinent to the Court's decision in this cause of action.
This Court, having now considered the pleadings, the testimony of the witnesses, joint stipulation of facts, the deposition testimony, and the documents, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law pursuant to Federal Rule Civil Procedure 52.

FINDINGS OF FACT
Ronald and Martha Jessup owned the M/V A-OK, a 1971 houseboat. The boat had two 165 horsepower Mercruiser engines, equipped with flame arresters, which were located in a stern engine compartment. A gasoline powered electrical generator sat between the two main engines, and two hatches covered the engine compartment at the stern of the boat. The Jessups purchased the vessel in 1992, and at the time of the accident, the Jessups moored their boat at the Yacht Club marina in St. Charles County, Missouri.
On June 24, 1998, Ron Jessup and Carol Walls, a friend of the Jessups, noticed a fuel leak in the area of the A-OK's starboard engine fuel pump. Mr. Jessup then shut down the starboard engine, and returned to his mooring slip under the power of the port engine. When he got back to the marina, Mr. Jessup went to the Yacht *916 Club's service department to discuss the need for repairs. He talked to the Yacht Club's service manager, Greg Brown, but Mr. Brown told him that there was a backlog of repair work, and he could not repair Mr. Jessup's boat before the time he needed it. Then, the Yacht Club's general manager, David Webber, entered the repair shop and Mr. Jessup, Mr. Brown and Mr. Webber discussed the needed repairs. Mr. Webber suggested that Charlie Schulte, a maintenance worker at the Yacht Club, could repair the fuel leak. Mr. Jessup asked Mr. Brown if Charlie Schulte was qualified to work on the boat, and Mr. Brown assured him that Mr. Schulte was "Mercruiser certified" and capable of working on the boat's fuel pump.
Mr. Schulte, however, was not certified by Mercruiser or any other company to perform work on boat engines. He had never replaced a fuel pump on a boat, and no one had ever explained to him how to replace a boat engine's fuel pump. Twenty-five years ago, Mr. Schulte was trained in automobile repair when he worked at an auto parts store and as a mechanic's helper. He was never trained in marine engine repair. His job at the Yacht Club did not generally entail working on boats, and he could not describe the difference between automobile and marine fuel pumps or their fuel systems. He did not work in the boat repair shop, but rather was a maintenance man for the Yacht Club.
Mr. Schulte went with Mr. Jessup and looked at the boat the same day that Mr. Jessup discovered the leak. Mr. Jessup started the boat, and Mr. Schulte noted that the starboard fuel pump leaked fuel when the engine ran near 1000 or 1500 RPM. Mr. Schulte then removed the fuel pump. He took the old fuel pump to Danco Auto Parts, and told the worker there that he needed a replacement. The store did not have that kind of fuel pump in stock, but said that they would get one. Mr. Schulte picked up a new fuel pump on June 26, 1998. That same day, Mr. Schulte installed the new fuel pump. After he installed the pump, he started the starboard engine to check for leaks. At 1500 or 2000 RPM, one of the fuel lines did leak. He tightened one of the fittings, but he was not sure which one he tightened. He testified that the leak stopped. He then called the Jessup residence, and left a message that the fuel leak had been repaired.
The Jessups were not on the boat again, until Monday, June 29, 1998. They arrived around 3:00 p.m. and Mr. Jessup started the engines. He let them run for about fifteen minutes before shutting them down. During that time, both engines ran fine. He then opened the engine compartment hatches and noticed the new fuel pump, as well as, a large amount of liquid in the engine compartment that he thought was rain water. He activated the bilge pump and left the compartment hatches open to aerate the engine compartment. He closed the engine compartment hatches some time before 7:00 p.m.
Around 7:00 p.m. on June 29, 1998, Drs. Bennett and Strong arrived at the boat. Drs. Bennett and Strong were potential buyers of the A-OK, and a sea trial had been arranged for that evening. Mr. Jessup showed Dr. Bennet the proper procedure for starting the boat, and started the engines without any problems. While the engines ran, Mr. Jessup and Dr. Bennett left the boat's cabin to remove the shore power cable and to untie the mooring lines. While working with one of the mooring lines, Mr. Jessup noticed one or both engines "loping" and saw smoke from the exhaust ports on the boat. He re-entered the boat's cabin and noticed the RPMs of the boat had dropped. He moved the throttle controls to increase the engine *917 RPMs, and almost immediately heard a loud thud later described as an explosion.
The bolted-down engine compartment hatches had completely blown off the boat and were lying in the water. There were flames coming out of the hatch area, near the center of the boat. Mr. Jessup immediately grabbed the fire extinguisher from the boat, and began spraying it down into the compartment. He saw the flames coming from the lower part of the bilge in the space between the port engine and the generator. The flames started to diminish, but returned after Mr. Jessup emptied the entire extinguisher on the flames. He reentered the cabin to retrieve another extinguisher, but the flames had already engulfed the entire stern of the boat.
The fire spread to other docks at the marina and other vessels. The A-OK sunk to the bottom of the harbor, and was obviously destroyed. The M/V My Prerogative, the M/V Lady Ellen, and the M/V Never Better were completely destroyed in the fire. Also, the Yacht Club's docks 26 through 33 were extensively damaged and destroyed by the fire. The A-OK was raised from the bottom of the harbor six days after the fire. The inspection revealed that the port engine sustained more significant fire damage than the starboard engine, however, the port fuel pump was attached securely while the starboard fuel pump was found loose. The two bolts holding the starboard pump to the engine block were very loose so that one could actually move the pump with one hand. In addition, the inlet connector was missing[2] and the outlet connector was very loose on the starboard side.
In reviewing the above facts, the Court finds as a factual matter that Mr. Schulte was not qualified to change the fuel pump on the A-OK. It also finds that the Yacht Club misrepresented Mr. Schulte's qualifications as "Mercruiser certified" to Mr. Jessup. Finally, the Court finds that the evidence proves that more likely than not, the fire was a result of a gasoline leak caused by the improper installation of the starboard fuel pump by Mr. Schulte, an employee and agent of the Yacht Club of St. Louis. The Court finds no negligence on the part of the Jessups for the accident.
The parties stipulated that the Sanders' vessel, the M/V Never Better, and its contents were valued at $60,000.00. The Court finds, based on the evidence, that the Smiths' vessel, the M/V My Prerogative, and its contents had a fair market value of $49,400.00. In addition, the Court finds that the Burfords' vessel, the M/V Lady Ellen, and its contents were valued at $58,660.50.
The Jessups, Smiths, Burfords, and Sanders each had a "Space Rental Agreement" with the Yacht Club. The Agreements contained the following exculpatory provision:
INSURANCE: TENANT AGREES that he will keep the boat fully insured with complete marine insurance, including hull coverage and indemnity and/or liability insurance.
THE LANDLORD DOES NOT CARRY INSURANCE covering the property of the TENANT. THE LANDLORD WILL NOT BE RESPONSIBLE for any injuries or property damage resulting, caused by, or growing out of the use of dock or harbor facilities; that the TENANT RELEASES AND DISCHARGES THE LANDLORD from any and all liability from loss, injury (including death), or damages to persons or property sustained while in or on the facilities of LANDLORD, including fire, theft, vandalism, windstorm, high *918 or low waters, hail, rain, ice, collision or accident, or any other Act of God, whether said boat is being parked or hauled by an Agent of LANDLORD or not.
Yacht Club of St. Louis Rental Agreement, ¶ 19. The Agreement also stated that boat rental was subject to the rules and regulations of the Yacht Club. The Yacht Club Rules and Regulations stated that "NO OUTSIDE MARINE SERVICE is allowed in the harbor. We feel we provide adequate service with our own Shop. All work done by outside contractors MUST be done at their harbor." ¶ 21.

CONCLUSIONS OF LAW
The Jessups brought this cause of action for exoneration from, or limitation of, liability. The Court found no negligence on the part of the Jessups, and therefore, will exonerate them from liability for the damage resulting from the fire aboard their vessel. This determination also makes their counterclaim against the Yacht Club for indemnification moot.
The Sanders, Smiths, and Burfords also brought state law claims of negligence against the Yacht Club. The elements of negligence are: 1) the existence of a duty; 2) breach of that duty; 3) injury proximately caused by breach of that duty; and 4) actual damages. Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc./Special Products, Inc., 700 S.W.2d 426, 431 (Mo.1985). Once the Yacht Club undertook the repairs on the Jessups' fuel pump, it owed a duty to exercise reasonable care and to repair it properly. The Yacht Club breached that duty when its employee, Mr. Schulte, improperly installed the new fuel pump causing the fire to erupt on the Jessups' vessel. The Sanders, Smiths, and Burfords suffered actual damage when their vessels were destroyed by the spreading fire.
The Yacht Club claims that even if Mr. Schulte was negligent in installing the new fuel pump, under the exculpatory provision of the "Space Rental Agreement," the Jessups and Claimants agreed to bear the risk of such a loss and release the Yacht Club from liability. The Claimants argue that the exculpatory clause does not shield the Yacht Club from its own negligence. The Court will assume that maritime law applies to the interpretation of this exculpatory clause.[3]
Traditionally, courts sitting in admiralty disfavored exculpatory clauses; however, today exculpatory provisions are routinely found to be valid by courts. La Esperanza de P.R., Inc. v. Perez y Cia de P.R., Inc., 124 F.3d 10, 19 (1st Cir.1997). Nonetheless, there is a split in the circuits as to the extent to which these types of exculpatory clauses are enforceable. The First and Eleventh Circuits hold that exculpatory clauses cannot absolve parties of all liability, and they must still provide a deterrent to negligence. Diesel "Repower", Inc. v. Islander Invs. Ltd., 271 F.3d 1318, 1324 (11th Cir.2001); La Esperanza, 124 F.3d at 19. The Ninth Circuit holds that exculpatory clauses are enforceable even when they completely absolve parties from liability for negligence. Royal Ins. Co. of Am. v. Southwest Marine, 194 F.3d 1009, 1014 (9th Cir.1999). The Eighth Circuit does not appear to have addressed this issue yet, but the Court finds that the approach of the First and Eleventh Circuits is more persuasive than that of the Ninth.
The Eleventh Circuit has set up a three-step test to determine whether an exculpatory clause is enforceable. Diesel "Repower", *919 271 F.3d at 1324. First, the clause must clearly and unequivocally indicate the parties' intentions. Second, the clause may not absolve the party of all liability and the liability risk must still provide a deterrent to negligence. Third, the "businessmen" must have equal bargaining power so there is no overreaching. Id.
The Yacht Club argues that the exculpatory provision is clear and explicitly relieves the Yacht Club of "any and all liability," which encompasses liability due to negligence. The Court disagrees. This provision is found in a Space Rental Agreement, under the title "INSURANCE." It does not state that it releases the Yacht Club of liability for negligent acts by it or its employees. Average individuals would assume that the provision means that they should carry insurance on their vessels, because the marina is not responsible for damages to the vessels while in the care of the marina. These individuals would not intend for this provision to mean that they were releasing the Yacht Club from liability for specific negligent acts taken by the Yacht Club. The Yacht Club heavily relies on a recent Delaware district court opinion, In re Wechsler, which held an exculpatory provision in a slip rental agreement enforceable. 121 F.Supp.2d 404, 436 (D.Del.2000). Interestingly, that provision specifically stated that the marina would not be liable for "any negligent acts or omissions by [the marina] and its employees." Id. at 435. The instant exculpatory provision is void of any similar language.
If the Court accepted the Yacht Club's interpretation, the clause would absolve the Yacht Club from all liability. The Yacht Club would have no liability risk and there would be nothing to deter it from being negligent. In addition, the parties to the agreement do not have equal bargaining power. The Space Rental Agreements are form-contracts that each claimant had with the Yacht Club. The Yacht Club is a corporation and the claimants are individuals who own leisure vessels. The Yacht Club also relied in its post-trial brief on Hudson Waterways Corp. v. Coastal Marine Serv., Inc., which enforced an exculpatory clause. However, in Hudson Waterways, the court emphasized that the contract entered into between the parties was "in no way an adhesion contract," and that the "parties were in an equal bargaining position." 436 F.Supp. 597, 606 (E.D.Tex.1977). The circumstances in the instant cause of action are very different.

CONCLUSION
The Court finds that the fire was a result of a gasoline leak caused by the improper installation of the starboard fuel pump by Mr. Schulte, an employee and agent of the Yacht Club of St. Louis. These actions constituted negligence on the part of the Yacht Club. The Court finds no negligence on the part of the Jessups for the accident, and therefore exonerates them from any liability for the incident. In addition, the Jessups counterclaim against the Yacht Club for indemnification is moot with this determination.
The Sanders, Smiths, and Burfords' negligent claims against the Yacht Club are valid. The exculpatory clauses found in the Space Rental Agreements do not release the Yacht Club from liability for its own negligent acts. The Court finds that exculpatory clauses which completely absolve a party from all liability are invalid. In addition, the language of this particular exculpatory clause did not clearly and unequivocally indicate that the Yacht Club was released from liability for its own negligence, and the provision was overreaching because of the unequal bargaining power of the parties. Therefore, the Yacht Club owes the Sanders $60,000.00, the Smiths $49,400.00, and the Burfords *920 $58,660.50 for the destruction of their vessels and the vessels' contents.
NOTES
[1] David and Joann Berg also made a claim, but dismissed their claim on November 13, 2000.
[2] The inlet connector was also missing on the port side.
[3] There was some dispute by the parties as to whether Missouri law or federal maritime law applies. However, the Court finds that under the particular circumstances of this cause of action, the result is the same under both Missouri and maritime law.