[L.A. No. 31549. May 26, 1983.]

FRANK FAHEY, Plaintiff and Appellant, v.
FRED GLEDHILL, Defendant and Respondent.

AETNA INSURANCE COMPANY, Plaintiff and Appellant, v.
FRED GLEDHILL, Defendant and Respondent.

COUNSEL

Richard P. MacNulty and Lewis D. Jones for Plaintiffs and Appellants.

Wied, Granby, Alford & Arkin, C. Douglas Alford and Elaine L. Chan for Defendant and Respondent.

OPINION

**BROUSSARD, J.**—Plaintiffs Frank Fahey and his insurer appeal from a judgment denying recovery for injury to Fahey's 50-foot yacht.

Fahey brought his yacht to defendant's marine repair facility in San Diego to have the bottom cleaned and painted and certain repair work done. He signed a work order containing an exculpatory clause. It provided that defendant would "not be liable for any loss of, or damage to said vessel, its contents or gear, or any loss of the use thereof from any cause whatsoever, excepting only willful misconduct on your part. It is understood that the vessel, its contents and gear is not insured or protected to the amount of the actual cash value against loss occasioned by fire, theft, vandalism, malicious mischief, loss of use or any other cause while it remains at the BOATYARD . . . . I acknowledge receipt of a copy hereof."

Defendant hauled the boat out of the water and did the agreed work. As defendant's employees were relaunching the vessel, it fell from defendant's marine railway and was badly damaged. Defendant hauled approximately 800 boats out of the water per year.

Fahey brought an action claiming negligence and gross negligence on the part of defendant, and the action was consolidated with an action brought by Fahey's insurer, as subrogee, for $125,000 it paid to Fahey. Pursuant to defense motion, the court first tried the issue of the validity and effect of the exculpatory clause.

The court found that Fahey had brought his yacht to defendant for maintenance and repairs on at least five prior occasions and signed an identical work order, that Fahey was aware of the exculpatory clause when he signed the work order, that at least one other marine repair facility available for the repairs in the San Diego area did not require execution of an agreement precluding liability for negligence, that Fahey, a sophisticated businessman, and defendant were

in equal positions with respect to the marine repair contract, and that the exculpatory clause was neither ambiguous nor overbroad.[1]

The court concluded that the work order constituted a maritime contract with its validity and interpretation governed by federal maritime law and that under federal law the contract validly exempted defendant from responsibility for negligent damage to the vessel while it was in his custody for repairs.

## I. FEDERAL OR STATE LAW

The basis of admiralty jurisdiction of the federal courts is article III, section 2 of the United States Constitution, and under the supremacy clause of article VI, the admiralty rules are applicable in state court litigation. ▪ State law is inapplicable to a maritime cause of action if it works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations. (*Intagliata* v. *Shipowners & Mer. etc. Co.* (1945) 26 Cal.2d 365, 372 [159 P.2d 1] (rejecting state defenses of contributory negligence and assumption of risk).)

"The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw. Precedent and usage are helpful insofar as they exclude or include certain common types of contract: *a contract to repair, Endner* v. *Greco,* 3 F. 411, . . . *is maritime,* but a contract to build a ship is not. *People's Ferry Co.* v. *Beers,* 20 How. 393." (Italics added.) (*Kossick* v. *United Fruit Co.* (1961) 365 U.S. 731, 735 [6 L.Ed.2d 56, 60-61, 81 S.Ct. 886].) While *Kossick* did not involve an agreement to repair a boat, numerous other cases have held that such agreements are maritime contracts to which admiralty law is applicable. (E.g., *United New York Sandy Hook Pilots Ass'n* v. *Rodermond Indus.* (3d Cir. 1968) 394 F.2d 65, 71; *Booth Steamship Co.* v. *Meier & Oelhaf Co.* (2d Cir. 1958) 262 F.2d 310, 312; *Hall-Scott Motor Car Co.* v. *Universal Ins. Co.* (9th Cir. 1941) 122 F.2d 531, 534; *Standard Oil Co.* v. *Intrepid, Inc.* (1972) 26 Cal. App.3d 135, 139 [102 Cal.Rptr. 604].)

Similarly, exculpatory agreements for ship accidents would ordinarily be maritime in character. "Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, *limitation of liability,* cargo damage, and claims for salvage." (Italics added.) (*Executive Jet Aviation* v. *City of Cleveland* (1972) 409 U.S. 249, 270 [34 L.Ed.2d 454, 468, 93 S.Ct. 493].)

---

[1]Defendant requests that we take judicial notice of Coast Guard documents showing that the home port of Fahey's yacht at the time of the accident was Portland, Oregon. Plaintiffs claim that the evidence is irrelevant. We agree.

*Kossick* recognized that, although a maritime contract was involved, there was a further question whether the contract was maritime and local "in the sense that the application of state law would not disturb the uniformity of maritime law." (365 U.S. at p. 738 [6 L.Ed.2d at p. 62].) In that case, a seaman became ill, and the owner sent him to the United States Public Service Hospital. The seaman, believing the treatment would be unsatisfactory, wanted private treatment, and the shipowner orally promised, if he would enter the hospital, to assume responsibility for all consequences of improper or inadequate treatment. The seaman subsequently sued the shipowner for injuries received as a consequence of improper treatment at the hospital. Holding that maritime law rather than New York's statute of frauds was applicable, the court reasoned that seamen were entitled to maintenance and cure at the first available port when they fell ill, that the contract was one which might have been made anywhere in the world, and that the New York law would invalidate the contract rather than supplement remedies available in admiralty, which permitted enforcement of the oral agreement. (365 U.S. at p. 738 et seq. [6 L.Ed.2d at p. 62 et seq.].)

However, the court rejected the view that a maritime interest, "no matter how slight or marginal," would displace necessarily a local interest, "no matter how pressing and significant," and concluded that the process was one of accommodation, "entirely familiar in many areas of overlapping state and federal concern, or a process somewhat analogous to the normal conflict of laws situation where two sovereignties assert divergent interests in a transaction as to which both have some concern." (365 U.S. at p. 739 [6 L.Ed.2d at p. 63].)

In *Wilburn Boat Co.* v. *Fireman's Ins. Co.* (1955) 348 U.S. 310, 321 [99 L.Ed. 337, 346, 75 S.Ct. 368], marine insurance, while within admiralty jurisdiction, was held to be a matter of state regulation rather than admiralty law. The court relied upon a history of state regulation without significant congressional interference and the fact that there was no admiralty rule governing the matter in issue.

In contrast there is a long history of admiralty courts regulating the liability of boat repair and service contractors, and the rights of boatowners to recover for injury and to be indemnified for loss. (E.g., *Italia Soc.* v. *Ore. Stevedoring Co.* (1964) 376 U.S. 315, 318 et seq. [11 L.Ed.2d 732, 737-738, 84 S.Ct. 748]; *Ryan Co.* v. *Pan-Atlantic Corp.* (1956) 350 U.S. 124, 132 et seq. [100 L.Ed. 133, 141-142, 76 S.Ct. 232]; *United New York Sandy Hook Pilots Ass'n* v. *Rodermond Indus., supra,* 394 F.2d 65, 70-72.) Similarly, admiralty courts have in numerous cases considered the validity and effect to be given to exculpatory clauses like that before us. Nor does it appear that California's policy against agreements exonerating a party for his own negligence is so overwhelming as to compel disregard of admiralty law. Our law recognizes the

validity of such agreements in some circumstances. (See *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92, 97 et seq. [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].)

It must be concluded that admiralty law in general governs the validity and interpretation of ship repair contracts, including exculpatory clauses. To conclude generally that all such contracts are maritime but local would in effect be contrary to the numerous cases applying admiralty law.

It is urged that admiralty law should not be applicable to noncommercial pleasure boats. Pointing out that admiralty law and jurisdiction were created to serve commercial shipping interests by providing a uniform body of law for the resolution of legal disputes arising among those engaged in it, Professor Stolz has urged that states should be permitted to regulate private pleasure craft aside from rules of the road, and laws relating to lights, maintenance of lifesaving and safety equipment, and similar matters. (Stolz, *Pleasure Boating and Admiralty: Erie at Sea* (1963) 51 Cal.L.Rev. 661.) As Professor Stolz points out, there are numerous differences between admiralty law, common law as developed by the states or some of them, and state statutory law; admiralty law applies comparative fault rather than contributory negligence, prohibits contribution between tortfeasors permitted in some states, requires total indemnity in a number of situations where common law courts deny indemnity or permit partial equitable indemnity, does not have statutes of limitation, and imposes a uniform duty of care to all visitors without regard to whether they are business invitees or social guests.[2] (51 Cal.L.Rev. at pp. 662-663.)

Obviously, noncommercial pleasure boats by definition do not involve maritime commerce, and the other basis for admiralty jurisdiction and law, uniformity, does not seem entitled to much more weight as to pleasure boats than it would be as to automobiles. Further, with most pleasure boat cases tried in state courts, state judges are precluded from devising a common law to meet the problems presented or seeking legislative solution. (51 Cal.L.Rev. at p. 718.) Yet, Professor Stolz recognized that the lower federal courts had uniformly applied admiralty law to pleasure boats in numerous cases. (51 Cal.L.Rev. at pp. 662, 709.)

Although Professor Stolz' views received some favorable comment in tort cases (e.g., *Richards* v. *Blake Builders Supply Inc.* (4th Cir. 1975) 528 F.2d

---

[2]Some of the departures from the traditional tort common law adopted by this court in recent years brought our law into accord with admiralty law. The major criticism of admiralty law is the federal Limitation of Liability Act (46 U.S.C. §§ 181-195), which limits the liability of the boatowner to the value of the boat for loss occurring without the privity of knowledge of the owner. (Stolz, *Pleasure Boating and Admiralty, supra,* 51 Cal.L.Rev. at pp. 705-712.) It is well to remember that California limits automobile owner liability for permissive users. (Veh. Code, §§ 17150, 17151.)

745, 747-748), the United States Supreme Court in effect recently rejected them in a tort case. In *Foremost Ins. Co.* v. *Richardson* (1982) 457 U.S. 668 [73 L.Ed.2d 300, 102 S.Ct. 2654], a boat towing a water skier and a small fishing boat collided in a navigable river in Louisiana. The river was seldom, if ever, used for commercial traffic. Neither of the boats had ever been used commercially. The court held that when the wrong occurs on navigable waters and there is a sufficient nexus to traditional maritime activity, admiralty has jurisdiction. The court refused to confine jurisdiction to vessels engaged in commercial maritime activity, reasoning that to effectuate the federal interest in protecting maritime commerce, all operators of vessels in navigable waters, including pleasure craft, must be subject to uniform rules of conduct and liability. The court also reasoned that confusion would ensue if jurisdiction turned on whether the boat was or had been chartered or used for commercial purposes. (457 U.S. at pp. 676-677 [73 L.Ed.2d at p. 307, 102 S.Ct. at p. 2659].) The dissenting opinion by Justice Powell signed by the Chief Justice, and Justices Rehnquist and O'Connor relied upon the Stolz article in urging that local concerns should prevail in the regulation of pleasure craft.

The United States Supreme Court having refused to exempt pleasure boats from the traditional admiralty law regulating torts where predictability is of less importance, there is not much reason to believe that it would exempt them from the traditional admiralty regulation of maritime contracts, particularly contracts relating to tort liabilities.

## II. FEDERAL LAW—EXCULPATORY CONTRACTS

■ Under admiralty law contractors who undertake to work on boats warrant by implication that they will perform services in a workmanlike manner, with reasonable safety to persons and property. While negligence also may give rise to liability, the implied warranty of workmanlike performance may give rise to liability even where the contractor is not negligent. And the shipowner's negligence or the unseaworthiness of his ship are not necessarily fatal to his claims. (*Italia Soc.* v. *Ore. Stevedoring Co., supra,* 376 U.S. 315, 319-320 [11 L.Ed.2d 732, 737-738]; *United New York Sandy Hook Pilots Ass'n* v. *Rodermond Indus., supra,* 394 F.2d 65, 71; *Standard Oil Co.* v. *Intrepid, Inc., supra,* 26 Cal.App.3d 135, 139.) "[T]he duty of workmanlike performance is, in effect, a form of strict liability which is imposed upon the contractor by law in case he breaches the implied term of the contract." (*Standard Oil Co.* v. *Intrepid, Inc., supra,* 26 Cal.App.3d 135, 139.)

The above rules establish the rights and liabilities of the parties in the absence of a valid agreement to the contrary. And the questions presented are whether an agreement providing that the repairer is free from liability for negligence,

ordinary or gross, is valid and whether the instant clause should be interpreted as such an agreement.

In *Hall-Scott Motor Car Co.* v. *Universal Ins. Co.* (9th Cir. 1941) 122 F.2d 531, it was held that the parties to a maritime contract to repair a vessel may validly stipulate that the repairer is freed from liability for his negligent injury to the vessel. The court recognized the doctrine that common carriers and others under like duty to serve the public cannot by any form of agreement secure exemption from liability for loss caused by their negligence, and that, while there was a direct conflict in the decisions, the Supreme Court appeared to have adopted the view that the towing boat could not seek exemption for negligent injury to the tow. On the other hand, the court reviewed two cases upholding exculpatory contracts of ship repairmen, Supreme Court cases in other situations where exculpatory clauses had been upheld even though involving common carriers where the engagements were not embraced within the common carriers' duty to the public, and a case where the captain of the tow boat went aboard the tow to pilot it under its own power and the exculpatory agreement was upheld (*Sun Oil Co.* v. *Dalzell Towing Co.* (1932) 287 U.S. 291 [77 L.Ed. 311, 53 S.Ct. 135]). The court also cited the Restatement of Contracts section 575 which permits exculpatory agreements with certain exceptions, the relevant one being when "one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public." (122 F.2d 531, 537.)[3]

Emphasizing the right of parties to freely contract, the court pointed out that the shipowner was at liberty to select any vendor of engines to replace its old engine and concluded that the vendor-installer was not a public utility or charged with a public duty. The court also stated that the practical effect of the agreement was to give the repairman the benefit of the owner's insurance against loss during the short period necessary for the repair. (122 F.2d at pp. 537-538.)

It is urged that *Bisso* v. *Inland Waterways Corp.* (1955) 349 U.S. 85 [99 L.Ed. 911, 75 S.Ct. 629], establishes that maritime agreements providing that a repairer is free from negligence liability are invalid. In that case, an oil barge while being towed up the Mississippi River collided with a bridge pier and sank. A provision of the tow contract provided that the towing movement should be at the sole risk of the barge. Relying upon its 1871 and 1928 decisions

---

[3]Restatement Second of Contracts section 195, subdivision (2)(b) provides that an agreement exempting a person from liability for negligence is invalid if the provision "exempts one charged with a duty of public service from liability to one whom that duty is owed for compensation for breach of that duty." (See also Rest.2d Torts, § 282.) Comment to section 195 in describing a duty of public service speaks of a "common carrier or public utility." The description is by way of example rather than limitation. The current position of the Restatement has neither changed nor substantially clarified the "public" duty or service test.

in similar circumstances, the court held that the exculpatory contract was contrary to public policy and invalid to the extent it released towers from liability for negligence. The court reasoned that its rule outlawing the exculpatory contracts was a particular application to the towage business of a general rule preventing enforcement of release from negligence contracts in many relationships such as bailors and bailees, employers and employees, and public service companies and their customers. (349 U.S. at pp. 90-91 [99 L.Ed. at p. 917].) The court said the reasons for the rule were to discourage negligence and to prevent overreaching by persons who have power to drive hard bargains. (349 U.S. at p. 91 [99 L.Ed. at pp. 917-918].) The court distinguished the pilotage case of *Sun Oil Co.* v. *Dalzell Towing Co., supra,* 287 U.S. 291, where the agreement provided that where the captain of the tug went on board the tow which was operating under its own power he became the employee of the tow. We recently recognized that under federal maritime law exculpatory and indemnification clauses in pilotage cases have been enforced in some situations. (*Societa per Azioni de Navigazione Italia* v. *City of Los Angeles* (1982) 31 Cal.3d 446, 465 [183 Cal.Rptr. 51, 645 P.2d 102].)

The United States Supreme Court subsequently held that exculpatory clauses in towage cases are not automatically invalid. In *S. W. Sugar Co.* v. *River Terminals* (1959) 360 U.S. 411 [3 L.Ed.2d 1334, 79 S.Ct. 1210], the exculpatory clause was contained in a tariff filed with the Interstate Commerce Commission, and it was held that it was for the commission to determine whether the rate specified in the relevant tariff is reasonably computed on the understanding that the clause shall relieve the towboat owner of the expense of insuring itself for negligence or whether the towboat is at once able to exact high rates and deny liabilities, which were fairly imposed based on the rates charged. The court stated that "[t]he rule of *Bisso,* however applicable where the towboat owner has 'the power to drive hard bargains,' may well call for modification when that power is effectively controlled by a pervasive regulatory scheme." (360 U.S. at p. 418 [3 L.Ed.2d at p. 1341].) The court pointed out that Congress had enacted a number of laws permitting carriers to contract for release of liability and that there was no general congressional policy requiring water carriers to be liable for their negligence in all cases. (360 U.S. at p. 420, fn. 9 [3 L.Ed.2d at p. 1342].)

*Bisso* may not be read as federal refusal to enforce all agreements releasing negligence liability in admiralty cases. The case may not be viewed as based solely on the policy to discourage negligence. In *Ryan Co.* v. *Pan-Atlantic Corp., supra,* 350 U.S. 124, 132 et seq. [100 L.Ed. 133, 141-142], a shipowner was permitted to recover its entire loss from a stevedoring contractor in implied indemnity whether or not the shipowner was negligent.

The reasoning of *Bisso* is tied to the history of the towing cases, the nature of the towing business and the public service concept. By distinguishing the pilot case, *Bisso* recognizes that exculpatory clauses in maritime contracts may be valid. It has been pointed out that "whatever the proper scope of the policy expressed in *Bisso,* it . . . rested on consideration with respect to the towage business strictly in American waters." (*The Bremen* v. *Zapata Off-Shore Co.* (1972) 407 U.S. 1, 15-16, fn. omitted [32 L.Ed.2d 513, 523, 92 S.Ct. 1907].) On this basis, it has been stated that the *Bisso* rule is limited to towage cases and that the policy expressed is inapplicable to other situations when there is equal bargaining power. (*United States* v. *5.96 Acres of Land* (9th Cir. 1979) 593 F.2d 884, 890-891; *Boston Edison Co.* v. *Great Lakes Dredge & Dock Co.* (1st Cir. 1970) 423 F.2d 891, 897.) Federal cases have subsequently enforced agreements releasing negligence liability in admiralty cases, not involving towage. (*Marr Enterprises, Inc.* v. *Lewis Refrigeration Co.* (9th Cir. 1977) 556 F.2d 951, 956; *A/S J. Ludwig Mowinckels R.* v. *Commercial Stevedoring Co.* (2d Cir. 1958) 256 F.2d 227, 231; *Hudson Waterways Corp.* v. *Coastal Marine Serv., Inc.* (E.D.Tex. 1977) 436 F.Supp. 597, 605 et seq.; *Island Creek Fuel & Transp. Co.* v. *Kenova Terminal Co.* (S.D.W.Va. 1957) 150 F.Supp. 479, 481-482.)

Unlike the tow cases, there is no history of cases invalidating exculpatory clauses in ship repair contracts, and ship repairers do not ordinarily have monopoly power in a port as sometimes occurs as to tow boat companies. The trial court found that the parties had equal bargaining power, and we are satisfied that under admiralty law they were free to include in their agreement a provision apportioning the risk of loss, including the risk due to their negligence.

While an exculpatory clause freeing the ship repairer from liability for his negligence may not be contrary to public policy and invalid, the question remains whether the instant agreement is such a contract. The rationale for permitting a party to disclaim responsibility for his own negligence is that parties to an agreement having substantially equal bargaining power may bargain over which is to bear the risk of loss and set the price accordingly, thus achieving a more rational distribution of the risk than the law would otherwise allow. "The rationale presupposes that the contracting parties have in fact considered the relative costs of insuring against negligent design and manufacture and have incorporated their conclusions into the contract." (*JIG The Third Corp.* v. *Puritan Mar. Ins. Under. Corp.* (5th Cir. 1975) 519 F.2d 171, 176-178.) For this reason, unless the intention is unequivocally expressed in the plainest of words, the law will consider that the parties did not undertake to protect a party against its own negligence.

While some older cases may have taken a somewhat different view, most of the recent federal cases have concluded that, although no specific words are

necessary such as a direct reference to "negligence," the language of the agreement to exclude negligence liability must be clear and unequivocal and go beyond describing the scope of the loss and reflect the physical or legal responsibility. (E.g., *Marr Enterprises, Inc.* v. *Lewis Refrigeration Co., supra,* 556 F.2d 951, 956; *JIG The Third Corp.* v. *Puritan Mar. Ins. Under. Corp.* (5th Cir. 1975) 519 F.2d 171, 176-178; *United States* v. *Seckinger* (5th Cir. 1969) 408 F.2d 146, 150 et seq.; *Batson-Cook Company* v. *Industrial Steel Erectors* (5th Cir. 1958) 257 F.2d 410, 412-414; *Hudson Waterways Corp.* v. *Coastal Marine Serv., Inc., supra,* 436 F.Supp. 597, 605.)

By excluding liability for any loss of or damage to the vessel from any cause whatsoever, the agreement clearly and unequivocally describes the scope of the loss.[4] However, it does not clearly and unequivocally reflect the physical or legal responsibility. The words "from any cause whatsoever" are unclear in that they may be read as describing the nature of the cause, such as fire or theft, rather than the person chargeable with fault in bringing about the loss. The qualifying phrase, "excepting only willful misconduct on your part," refers to the defendant's conduct, but because it is phrased by way of exception, it merely provides a negative implication that the exculpatory portion of the sentence is applicable to negligence of the defendant. Rather than adopt this negative implication, a party to the agreement might conclude that the negative implication was that the exculpatory portion of the sentence applied to willful misconduct of third parties. The second sentence of the clause merely states that there is no insurance of the boat and its contents. It does not deal with the subject of liability insurance or indicate in any way that defendant should not be liable for his negligence.[5] To the contrary, by enumerating causes, such as theft, vandalism, and malicious mischief, which are ordinarily the result of third-party conduct, the sentence might be understood as indicating that the ambiguous exculpatory provision in the prior sentence is limited to third-party misconduct. The exculpatory provision does not mention negligence by defendant and his employees and does not clearly reflect that it excludes liability for defendant's negligent launching of the vessel.

Because the agreement does not clearly and unequivocally exclude defendant's liability for negligence, we conclude that the trial court erred in determining that the agreement compelled judgment for defendant.

---

[4]As stated earlier, the agreement provided that defendant would "not be liable for any loss of, or damage to said vessel, its contents or gear, or any loss of the use thereof from any cause whatsoever, excepting only willful misconduct on your part. It is understood that the vessel, its contents and gear is not insured or protected to the amount of the actual cash value against loss occasioned by fire, theft, vandalism, malicious mischief, loss of use or any other cause while it remains at the BOATYARD . . . . I acknowledge receipt of a copy hereof."

[5]The sentence appears designed to disclaim the liability imposed upon repairers of personal property by section 1858 et seq. of the Civil Code in the absence of such disclaimer.

The judgment is reversed.

Bird, C. J., Mosk, J., and Reynoso, J., concurred.

**KAUS, J.,** Dissenting.—In *Paraiso* v. *United States* (1907) 207 U.S. 368, 372 [52 L.Ed. 249, 251, 28 S.Ct. 127], Justice Holmes spoke of "the inability of the 17th century common law to understand or accept a pleading that did not exclude every misinterpretation capable of occurring to an intelligence fired with a desire to pervert." Substitute "exculpatory clause" for "pleading" and it becomes evident that the majority dissects the clause in issue here with the mind-set of a 17th century pleader.

It seems plain to me that, unless we are in an area where exculpatory clauses are simply invalid (e.g., *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]), it takes a real effort at ignoring the obvious to construe the clause in issue here as failing to exculpate Gledhill from negligence—gross or simple. The fact that "wilful misconduct" is expressly not excused plainly makes the exculpatory clause applicable to any less culpable standard of conduct.

Thus, assuming that the majority is correct in concluding that exculpatory clauses are in general valid under the controlling federal admiralty decisions—and I have no reason to doubt it—I believe the judgment should be affirmed.[1]

What I find odd is that so much admiralty learning is devoted to an issue which eventually comes out in the wash. If, as the majority holds, the clause is not sufficiently specific to exculpate Gledhill from liability for negligence even under the more benign admiralty standards (see *Hall-Scott Motor Car Co.* v. *Universal Insurance Co.* (9th Cir. 1941) 122 F.2d 531, cert. den. 314 U.S. 690 [86 L.Ed. 552, 62 S.Ct. 360]; *JIG The Third Corp.* v. *Puritan Mar. Ins. Under. Corp.* (5th Cir. 1971) 519 F.2d 171, 178), it surely is inadequate under California law. (See, e.g., *Vinnell Co.* v. *Pacific Elec. Ry. Co.* (1959) 52 Cal.2d 411, 415 [340 P.2d 604].) If so, why inquire which law applies?

I respectfully dissent.

Richardson, J., and Beach J.,* concurred.

---

[1] I have carefully reviewed the federal authorities which the majority cites. None is even remotely in point.

*Assigned by the Chairperson of the Judicial Council.

**BEACH, J.,*** Dissenting.—I fully concur in the dissent. The exculpatory provision is valid under California and federal law.

Nonetheless, I add to my concurrence in the dissent to respectfully suggest that federal law whether described as "maritime" or "admiralty" is inapplicable to this case.

Although boat repairs relate to maritime activity, federal law is not always exclusively applicable to such activity. Nothing in the case before us demonstrates that application of California contract law conflicts with or is hostile to any congressional act. Nor is there thus any interference with any paramount or important national interest or purpose. In such circumstances application of state law is proper and preferable. (*Askew* v. *American Waterways Operators, Inc.* (1973) 411 U.S. 325 [36 L.Ed.2d 280, 93 S.Ct. 1590]; *Kossick* v. *United Fruit Co.* (1961) 365 U.S. 731, 738-739 [6 L.Ed.2d 56, 62-63, 81 S.Ct. 886]; *Huron Cement Co.* v. *Detroit* (1960) 362 U.S. 440 [4 L.Ed.2d 852, 80 S.Ct. 813, 78 A.L.R.2d 1294]; *Romero* v. *International Term. Co.* (1959) 358 U.S. 354 [3 L.Ed.2d 368, 79 S.Ct. 468]; *Wilburn Boat Co.* v. *Fireman's Ins. Co.* (1955) 348 U.S. 310 [99 L.Ed. 337, 75 S.Ct. 368]; *Skiriotes* v. *Florida* (1941) 313 U.S. 69 [85 L.Ed. 1193, 61 S.Ct. 924]; *Just* v. *Chambers* (1941) 312 U.S. 383 [85 L.Ed. 903, 61 S.Ct. 687]; *Western Fuel Co.* v. *Garcia* (1921) 257 U.S. 233 [66 L.Ed. 210, 42 S.Ct. 83]; *The J. E. Rumbell* (1893) 148 U.S. 1, 12-13 [37 L.Ed. 345, 347, 13 S.Ct. 498]; *Sherlock* v. *Alling* (1876) 93 U.S. 99 [23 L.Ed. 819]; *The Lottawanna* (1875) 88 U.S.(21 Wall.) 558, 580 [22 L.Ed. 654]; *Amer. Steamboat Co.* v. *Chace* (1873) 83 U.S. (16 Wall.) 522 [21 L.Ed. 369]; *The City of Norwalk* (1893) 55 Fed. 98.)

Respondent's petition for a rehearing was denied July 14, 1983. Richardson, J., and Kaus, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.