952 So.2d 709 (2006)
John HARKINS and the Hanover Insurance Company
v.
M.G. MAYER YACHT SERVICES, INC., Maritime Systems, Inc. and Lloyds Underwriters at London.
No. 2005-CA-0668.
Court of Appeal of Louisiana, Fourth Circuit.
December 13, 2006.
Rehearing Denied April 16, 2007.
*711 Allen H. Borne, Ryan P. Reece, Orleans, LA, for Plaintiffs/Appellees.
William A. Ransom, III, Ransom Law Offices, Mandeville, LA, for M.G. Mayer Yacht Services, Inc. and Maritime Systems, Inc.
Robert A. Redwine, New Orleans, LA, for Certain Underwriters at Lloyd's London.
Stephen W. Glusman, Glusman, Broyles & Glusman, LLC, Baton Rouge, LA, for M.G. Mayer Yacht Services, Inc.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE).
Judge MICHAEL E. KIRBY.
Defendants, M.G. Mayer Yacht Services, Inc., and its insurer, certain underwriters at Lloyd's London and Maritime Systems Inc., appeal the Judgment of the trial court in favor of plaintiffs, John B. Harkins, Jr., and Hanover Insurance Company.
STATEMENT OF THE FACTS
On or about August 24, 1999, Mr. Harkins brought his sixty-two feet long powered sailing vessel, the S/V APPARITION,[1] insured by Hanover Insurance Company, to M.G. Mayer Yacht Services, Inc. ("Mayer") for numerous repairs. Mr. Harkins had used Mayer for repairs to his pleasure craft eight or nine times over the course of a few years, including a brand new paint job in 1997. This time, Harkins requested that Mayer install a dripless shaft system and repair the yacht's refrigeration unit. Mayer installed the dripless shaft system and subcontracted the refrigeration work to Paul Dumstorf ("Dumstorf") of Maritime System's Inc. ("Maritime").[2]
Before beginning work on the APPARITION, Harkins signed a "work order" to authorize the requested repairs and improvements. Mayer had used this same work order for decades, and Mr. Harkins would have received it at least eight or nine times.[3] The front of Mayer's work order listed the work to be done, while the back listed twenty-one (21) "terms and conditions," including the following:
1. This work order is subject to the following terms and conditions which shall constitute the entire contract between Mayer Yacht, Inc., * * * and the vessel described and its owners, * * *.
2. Mayer Yacht Services agrees to repair said vessel in a good and workmanlike manner pursuant to the terms as outlined, and the Owner and/or vessel agrees to pay mayer (sic) for said work, labor and materials as hereinafter stated. * * * IT IS UNDERSTOOD AND AGREED THAT OTHER THAN AS SPECIFICALLY SET FORTH HEREIN, MAYER YACHT SERVICES MAKES NO WARRANTIES EXPRESSED OR IMPLIED, WITH *712 RESPECT TO MAYER'S WORKMANSHIP OR MATERIALS FURNISHED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR USE; NOR DOES MAYER ASSUME NOR DOES IT AUTHORIZE ANYONE ELSE TO ASSUME ON ITS BEHALF, ANY OBLIGATION OR LIABILITY IN CONNECTION WITH THE SALE OR INSTALLATION OF EQUIPMENT MADE OR MANUFACTURED BY AN ENTITY OTHER THAN MAYER; WITH RESPECT TO SUCH EQUIPMENT, THE WARRANTIES AGAINST DEFECT IN MATERIAL AND WORKMANSHIP BY THE BUILDER AND/OR MANUFACTURER OF SUCH EQUIPMENT, ARE THE SOLE WARRANTIES, EXPRESSED AND/OR IMPLIED, PERTAINING TO THE SALE AND/OR INSTALLATION OF SUCH EQUIPMENT.
3. MAYER WARRANTS THE MATERIALS (WITH THE EXCEPTION OF EQUIPMENT MANUFACTURED BY OTHERS AS AFORESAID) AND WORKMANSHIP TO BE FREE OF DEFECT FOR A PERIOD OF SIXTY (60) DAYS AFTER COMPLETION OF SAID WORK AND MAYER'S LIABILITY IN CASE OF DEFECTIVE WORKMANSHIP OR MATERIALS SHALL BE LIMITED STRICTLY TO THE PROPER REPLACEMENT THEREOF, IN NO EVENT SHALL MAYER BE LIABLE FOR CONSEQUENTIAL DAMAGES ARISING FROM DEFECTIVE MATERIALS OR WORKMANSHIP, OR STEMMING FROM A BREACH OF WARRANTY, EXPRESSED OR IMPLIED, WITH RESPECT TO EQUIPMENT MANUFACTURED BY OTHERS, WHICH IS INSTALLED
* * *
7. No claim for damages for negligence or otherwise, or for defective workmanship or material, shall be valid, and Mayer shall be discharged from all such liabilities therefore, unless such claim is made to Mayer in writing within sixty (60) days after delivery of vessel or completion of the work, whichever first occurs.
8. Mayer shall be liable for any loss or injury to the vessel caused by its willful or negligent failure to exercise reasonable care but Mayer shall not be responsible for damage to said vessel while in the possession of Mayer; * * *. The owner must give written notice to Mayer of any claim for loss or damages within 15 days after the loss or damage becomes known or reasonably should have become known.
The APPARITION was then left with Mayer for the requested repairs. After they were completed in mid to late January 2000, it was sailed from the New Orleans repair yard to Harkins' home in Slidell without leaks. Almost immediately Harkins noticed the refrigeration unit was not working properly so he called to inform Mayer, since he was concerned it had not been fixed properly. On February 3, 2000, he formally reported the problem in writing. Harkins also testified that his new paint job had been dulled and white streaks were now present on his deck. Mayer sent employees to Harkins home to repair the damage to the paint, but, the employees worsened the damage by applying a bleaching and abrasive cleaning solution. Neither Mr. Dumstorf or Mayer ever addressed the refrigeration problem.
*713 On or about July 5, 2000, Harkins sailed the APPARITION to Pensacola, Florida for its first extended voyage since the repair work. While off the coast of Pensacola, the vessel became grounded on a sand bar. Harkins reversed the engine at high revolutions per minute to disengage the boat from the sand bar. Shortly thereafter, he noticed the engine was not operating properly, so he lifted floorboards to look into the engine compartment to discover it, battery boxes and the hold area filled with about two feet of water. However, Harkins managed to safely navigate to Pensacola.
Harkins contacted Mayer later that day and related that there were no set screws in the dripless shaft unit. Harkins installed four (4) set screws and has experienced no problems with the dripless shaft system.
Harkins left the APPARITION at the Pensacola Marine Shipyard Complex ("PMSC"). While at the PMSC, based upon the advice of a refrigeration repairman in Pensacola, Harkins paid for a completely new refrigeration system.
Harkins contacted Mayer again upon returning from Pensacola and made demand for compensation for the damage allegedly caused by substandard workmanship, but no resolution was achieved.
PROCEDURAL HISTORY
On April 6, 2001, Harkins filed this suit for the damages caused by Mayer Yacht's and Maritime's alleged defective workmanship.
Mayer Yacht and Maritime filed an Answer and Reconventional Demand asserting several contractual defenses and alleging that Harkins still owed money for the repair work to his boat.
On October 21, 2004, the Civil District Court conducted a trial. On December 10, 2004, Judgment was rendered in favor of Harkins in the amount of $44,088.28 ($11,392.21 for the costs associated with repairing and replacing the boat's damaged parts and interior; $1,700.00 for the dockage fees; $10,876.85 for the new refrigeration unit; and $20,119.22 for a new paint job). Mayer Yacht's claim for unpaid money for repairs was dismissed. On January 31, 2005, the defendants suspensively appealed the Judgment.
ASSIGNMENTS OF ERROR:
They have assigned six errors on the part of the trial court. First, it is alleged that the court committed error in not applying the exculpatory warranty limitation period contained in the work order. Secondly, they contend the court below erred in finding that Mayer and/or Maritime breached any warranties as to the refrigeration system. Third, they contend the trial court awarded plaintiffs' damages for betterment of the refrigeration system. The fourth assignment avers the trial court erroneously admitted into evidence an estimate from Schubert's Marine to repaint the APPARITION. The fifth assignment claims that excessive damages were awarded to plaintiffs for paint repairs. The final assignment asserts error in denying Mayer recovery on its unpaid invoices.
DISCUSSION:
On appeal Mayer argues that maritime law applies and thus, the contractual exculpatory clauses contained in the work order are triggered, negating any liability of Mayer or its subcontractor. Mayer also argues that because the trial court proceeded based upon a breach of contract theory and since it did not find gross negligence, an exception to the exculpatory clause under the general maritime law, it should not be liable.
La Esperanza de Puerto Rico v. Perez y Compania de Puerto Rico, Inc., 124 F.3d *714 10 (1st Cir.1997), stands for the proposition that a contract to repair a vessel is a maritime contract to which the general maritime law of the United States is applicable. Numerous cases have held that boat repair agreements are maritime contracts to which admiralty law is applicable. (E.g., United New York Sandy Hook Pilots Ass'n. v. Rodermond Indus. (3d Cir. 1968) 394 F.2d 65, 71; Booth Steamship Co. v. Meier & Oelhaf Co. (2d Cir.1958) 262 F.2d 310, 312; Hall-Scott Motor Car Co. v. Universal Ins. Co. (9th Cir.1941), 122 F.2d 531, 534; Standard Oil Co. v. Intrepid, Inc. (1972) 26 Cal.App.3d 135, 139, 102 Cal.Rptr. 604.)
We note that exculpatory agreements for ship accidents are ordinarily maritime in character, although some courts go further in inquiring whether the contract was local "in the sense that the application of state law would not disturb the uniformity of maritime law." Kossick v. United Fruit Co. (1961) 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 81 S.Ct. at p. 891. Nevertheless, courts have rejected the view that a slight or marginal maritime interest automatically displaces a local interest if pressing and significant.
There is a long history of admiralty courts regulating the liability of boat repair and service contractors, and the rights of boat owners to recover for injury and to be indemnified for loss. (E.g., Italia Soc. v. Ore. Stevedoring Co. (1964) 376 U.S. 315, 318, 84 S.Ct. 748, 750, 11 L.Ed.2d 732 et seq.; Ryan Stevedoring Co. v. Pan-Atlantic SS Corp. (1956), 350 U.S. 124, 132, 76 S.Ct. 232, 236, 100 L.Ed. 133 et seq.; United New York Sandy Hook Pilots Ass'n v. Rodermond Indus., supra, 394 F.2d 65, 70-72.) Similarly, admiralty courts have in numerous cases considered the validity and effect to be given to exculpatory clauses like that before us. It does not appear that Louisiana's policy in the personal injury area against agreements exonerating a party for his own negligence is so overwhelming as to compel disregard of admiralty law.
It must be concluded that admiralty law in general governs the validity and interpretation of ship repair contracts, including exculpatory clauses. To conclude generally that all such contracts are maritime but local would in effect be contrary to the numerous cases applying admiralty law.[4]
Even though we recognize that some courts' analysis have allowed the causes of action for factual scenarios similar to the paint job and the air conditioning issues here to fall under state law because these jobs were performed on land and the damage was recognized while on land, such findings are the exception and not the rule. Therefore, because the damage suffered due to failure to install the set screws occurred while located on navigable waterways, we find Harkins' contract with Mayer to repair this yacht falls under general maritime law.
Under admiralty law contractors who undertake to work on boats warrant by implication that they will perform services in a workmanlike manner, with reasonable safety to persons and property. While negligence also may give rise to liability, the implied warranty of workmanlike performance may give rise to liability even where the contractor is not negligent. And the shipowner's negligence or the unseaworthiness of his ship are not necessarily fatal to his claims. Italia Soc. v. Ore. Stevedoring Co., supra, 376 *715 U.S. 315, 319-320, 84 S.Ct. 748, 751, 11 L.Ed.2d 732; United New York Sandy Hook Pilots Ass'n v. Rodermond Indus., supra, 394 F.2d 65, 71; Standard Oil Co. v. Intrepid, Inc. (1972), 26 Cal.App.3d 135, 139, 102 Cal.Rptr. 604. "[T]he duty of workmanlike performance is, in effect, a form of strict liability which is imposed upon the contractor by law in case he breaches the implied term of the contract." Standard Oil Co. v. Intrepid, Inc., supra, 26 Cal.App.3d 135, 139, 102 Cal.Rptr. 604.
Exculpatory contracts of ship repairmen have been upheld in general maritime law based upon the theory of freedom to contract. Sun Oil Co. v. Dalzell Towing Co. (1932) 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311. Bisso v. Inland Waterways Corp. (1955) 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911, is a case in which an exculpatory clause was not enforced in maritime law, but this was a towage case, and subsequent cases have held that an exculpatory clause in a towage case is not automatically invalid. The rule of Bisso arose in a situation where the towboat owners, like common carriers or public service providers, had unequal bargaining power to insert such exculpatory clauses absolving them from liability.
Unlike the tow cases, there is no history of cases invalidating exculpatory clauses in ship repair contracts, and ship repairers do not ordinarily have monopoly power in a port as sometimes occurs as to tow boat companies. There is nothing in the record that indicates that the parties had unequal bargaining power, and we are satisfied that under admiralty law they were free to include in their agreement a provision apportioning the risk of loss, including the risk due to their negligence.
While an exculpatory clause freeing the ship repairer from liability for his negligence may not be contrary to public policy and invalid, the question remains whether the instant agreement is such a contract. The rationale for permitting a party to disclaim responsibility for his own negligence is that parties to an agreement having substantially equal bargaining power may bargain over which is to bear the risk of loss and set the price accordingly, thus achieving a more rational distribution of the risk than the law would otherwise allow. "The rationale presupposes that the contracting parties have in fact considered the relative costs of insuring against negligent design and manufacture and have incorporated their conclusions into the contract." JIG The Third Corp. v. Puritan Mar. Ins. Under. Corp. (5th Cir. 1975), 519 F.2d 171, 176-178. For this reason, unless the intention is unequivocally expressed in the plainest of words, the law will consider that the parties did not undertake to protect a party against its own negligence.
Here, the work order does state that "MAYER YACHT SERVICES MAKES NO WARRANTIES EXPRESSED OR IMPLIED . . .", nevertheless such language is listed amidst twenty-one (21) other such provisions. As itemized above the seventh and eighth provisions make similar exculpatory statements after sixty (60) and fifteen (15) days respectively have passed without written notice of a claim. Federal jurisprudence does not specify any sacramental language as to what is sufficient to be a clear and unequivocal absolution of liability. As long as the language appears to go beyond describing the scope of the loss and reflects the physical and legal responsibility, it is sufficient. United States v. Seckinger (5th Cir.1969), 408 F.2d 146, 150 et seq.; Batson-Cook Company v. Industrial Steel Erectors (5th Cir.1958), 257 F.2d 410, 412-414. Our review of the case law and this work order, does not lead us to conclude that there was a flaw in the *716 contractual language as concerns the exculpatory clause.
A recent federal case gave new insight into the enforceability of an exculpatory clause, or red letter clause, asserted by a marina defendant, stating:
. . . it is necessary to examine whether public policy supports restricting such absolution of all liability for the marina's own negligence and outweighs the liberty to contract. Exculpatory clauses are not per se unlawful, and may be enforced in appropriate circumstances based on "the consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk and allocation of price than the law would otherwise allow." Sander, 334 F.3d at 717 (quoting La Esperanza, 124 F.3d at 19). In weighing competing public policy considerations, there is general agreement among the circuits that the following three factors are relevant in determining whether to enforce an exculpatory clause in a marine contract: (a) the nature of services covered by the contract; (b) whether the exculpatory clause is being applied to intentional, reckless, or grossly negligent behavior or rather to ordinary negligence; and (c) whether the exculpatory provisions were obtained through overreaching. See Sander, 334 F.3d at 717, Royal Ins. Co. of America v. Southwest Marine, 194 F.3d 1009, 1014 (9th Cir.1999), La Esperanza, 124 F.3d at 19, Edward Leasing, 785 F.2d at 889.
Dominici v. Between the Bridges Marina, 375 F.Supp.2d 62, 66.
At trial Mr. Harkins testified that while the APPARITION was still with Mayer Yacht, Mr. Mayer had showed him the new dripless shaft system and informed him that installation was incomplete as his trained installer, Ralph Blackmon, had not yet installed the set screws. Mr. Harkins testified that the rubber bellow that connects to the "O" ring, or dripless gland donut, was hard to move and that is why he could have 35 hours of engine run time without a leak. He offered this as justification as to why the seal of the dripless shaft system held up until the time he had to run the engine at higher revolutions per minute which in turn makes the propeller shaft vibrate more and thus caused the bellows to loosen allowing the seal to break and water to enter the hull. Harkins introduced product information that explained the role of the set screws and where they attach in order to maintain the seal even with greater vibration in the propeller shaft.
Mr. Mayer testified that the dripless shaft systems like this one came into the market around the mid-1990s. He also testified that he had an employee, Ralph Blackmon, whom he oversaw, work on the APPARITION's dripless shaft system. Around the time of the work on the APPARITION Blackmon had taken time off due to difficulties in his personal life. Nevertheless, he testified that Mr. Blackmon did not have alcohol and drug problems at the time he worked on the APPARITION. Mr. Mayer further stated that the test of the seal would have been conducted at the dock, while running the engines not at high RPM.
Mr. Mayer in prior deposition testimony had stated that he believed there were only two set screws required initially by the manufacturer. At trial Mr. Mayer stated that the reason why four set screws were required by the manufacturer was for double protection, i.e., two set screws to lock in the two set screws that held the dripless gland donut compressed by the bellows. Otherwise, if the set screws are not in to hold the compression donut in *717 place, the donut will loosen itself from the bellows and the device will leak. Mr. Mayer also testified that he could think of no way that the APPARITION could have made it to Pensacola or much less to Slidell without at least two set screws being in place, because he would think that the bellows would back out rather quickly creating a leak even at 1200 RPM, much less high RPM. Mr. Mayer could give only one example of set screws backing out, but that was not on this new technology PSS dripless shaft system. Furthermore, Mr. Mayer stated that when Mr. Harkins ran aground and took on water, there would have been much excitement while working the bilge pump and bailing water out in buckets, that two set screws could easily have been pumped or bailed out without anyone noticing. In other words, just because Mr. Harkins did not find set screws, does not mean they were not there.
General maritime law, tells us that "gross negligence" can be defined as "reckless and wanton misconduct." Complaint of Merry Shipping, Inc., 650 F.2d 622, at 624-5, (5th Cir.1981) (quoting In re Marine Sulphur Queen, 460 F.2d 89, 105 (2nd Cir.), cert denied, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972)). Using this definition of gross negligence and applying the second factor in the Dominici enforceability test for exculpatory clauses to the dripless shaft system failure, we find that failure to install the four set screws is grossly negligent behavior because it was a failure to follow the manufacturer's instructions, and because of such conduct, the exculpatory clause cannot be enforced by Mayer.
In a maritime action in state court the procedural law of the forum governs. Jackson v. Northbank Towing Corp., XXXX-XXXX (La.App. 3 Cir. 3/3/99), 742 So.2d 1; Bergeron v. Main Iron Works, Inc., 563 So.2d 954 (La.App. 1 Cir. 1990). Therefore, the trial court's implication in its Reasons for Judgment that since Harkins did not plead negligence, it could not be found, was misleading. In Louisiana fact pleading is all that is required; no longer does Louisiana require pleading of the theory of the case. La. C.C.P. arts. 854 & 891; Trust for Schwegmann v. The Schwegmann Family Trust, 05-95 (La. App. 5 Cir. 5/31/05), 905 So.2d 1143; Fitzgerald v. Tucker, 98-2313 (La.6/29/99), 737 So.2d 706.
Stated in contractual terms, as opposed to tort, we concur with the trial court that failure to install the set screws, as stated in the installation instructions of the manufacturer of the dripless shaft system, is equivalent to breaching a term of the work order contract, namely, failure to install the dripless shaft system, as opposed to simply locating it around the shaft of the propeller, as the trial court found the preponderance of evidence in the record to show in this case. Therefore, we affirm the trial court's award for damages due to the dripless shaft system failure.
REFRIGERATION UNIT & PAINT JOB
Insofar as the refrigeration and paint job are concerned, the issue of the exculpatory clause takes a different twist because Mr. Harkins notified, through telephone calls and in writing, Messrs. Mayer and Dumstorf immediately after taking possession of the APPARITION of problems with both. Defendants argue that the notice was not specific enough as concerns the refrigeration unit.
Harkins letter to Mayer dated February 3, 2000, mentioned the problems with the paint job and stated as concerns the refrigeration unit that:
The fridge may still have water in the refrigerant lines as the valves are shutting the system down without it getting *718 down to the temperature set by the thermostat.
In response to this letter, Mayer sent his employees out to Harkins' home to fix the paint job. Nevertheless, there was testimony that the employees used "soft scrub" on the paint job which bleached the paint job and diminished some of the traction properties of the "grip awl" paint job.
The most significant issue with the paint job was that of quantum and whether Schubert's paint job estimate was properly admitted into evidence. The trial court ruled that Schubert's paint job estimate for the yacht of $20,119.22, would be admissible, but excluded a witness, Mr. John Brimer, from Schubert's to identify it. Mr. Brimer's name and the estimate had been added to the witness and exhibit list after the cut-off date. The net effect was Mr. Harkins identified it as being received from Schubert's, but the defense did not have anyone to cross examine on how Schubert's arrived its estimate[5].
In the record dated May 21, 2004, is the Pre-Trial Outline, in which plaintiffs' list the estimate of damages to repair the paint on the APPARITION. Even though the original trial date was set for June 2004, trial of this matter was continued until October 2004. We note that we could not find a corresponding extension of discovery dates. Also, prior to trial and discussed in the record, there was a meeting in chambers in which this exhibit was mentioned and the trial judge understood that defense counsel was not concerned with the prejudice of the estimateeven though defense counsel thought the trial court had misunderstood him. Defendants did not file a motion in limine regarding Schubert's paint estimate until two weeks before trial.
Defendants cite Perry v. Law, 311 So.2d 283 (La.App. 1 Cir.1974) for the proposition that adherence to court rules is not discretionary. This case is easily distinguishable in that Perry dealt with a trial court setting a trial date during vacation time of the court without the consent of all parties. Our brethren issued a writ of prohibition ordering the trial date be set aside as it contravened the provisions of Rule 1, Section 3 of the Rules of the Twenty-first Judicial District Court. Here we are dealing with admission of evidence, as opposed to trial dates and we distinguish between a case management order pro hoc and a local rule of the court.
The issue of the paint job was clearly contested and defendants had notice back in May of this exhibit, and thus cannot argue prejudice. We note jurisprudence that a party may waive or be estopped from making an objection to the admission or exclusion of evidence. That waiver may arise from failure to object, from an act done or omitted before evidence is offered, or from some affirmative act done after the court's ruling on the evidence. Cross v. Cutter Biological, Div. Of Miles, Inc., 94-1477 (La.App. 4 Cir. 5/29/96), 676 So.2d 131, at 139 (citing Combs v. Hartford Insr. Co., 544 So.2d 583, 585-86 (La.App. 1 Cir.1989)). Here, defense counsel knew of the existence of this exhibit and plaintiff's intent to use it at trial. Defense counsel either made representations in chambers in the affirmative or omitted to do so, took no writs on this matter, and was possibly seeking some tactical advantage at trial. We find the trial court did not abuse its discretion by admitting the estimate.
*719 Defendants argue that the award of a new paint job puts plaintiff in a better position than before. Nevertheless, there is evidence that the soft scrub removed some of the grip surface of the paint job and caused damage around the stanchions thus ruining more than just the appearance, impacting safety features and exposing the boat to undue wear and tear. Moreover, as concerns the factual findings of the trial court pertaining to the award for the paint job, we find no manifest error.
Two refrigeration repairmen who had worked on the APPARITION at different times testified at trial. Mr. Dumstorf, of Maritime Systems, Inc., and Mr. Robert "Bob" Barney testified that there was an improper design in the APPARITION's refrigeration system. It was designed with two compressors, one driven by a 115 volt electrical generator and another driven by the engine. They were tied into and shared a common oil laden refrigerant line. Thus, when one compressor turned off and the other one was on, the other could not recover the oil it needed to operate, ultimately resulting in compressor failure. This type of system is now replaced with dual, not shared, systems because it ensures that each compressor has its own supply of oil in its own circuit. Mr. Dumstorf testified that he replaced the engine driven compressor and flushed out the sludge in the system, as well as placed a new filter with a desiccate pack to remove any residual moisture in the system. Mr. Harkins admitted that he had Mr. Barney replace a compressor about a year before the yacht was taken to Mayer in August of 1999. In sum, the APPARITION's refrigeration system had an improper design that resulted in repeated compressor unit failures requiring replacement around three times in two years.
Mr. Barney testified that he had worked on the APPARITION's refrigeration system a couple of times and had replaced two compressors previously due to malfunction. Mr. Barney testified that when he inspected the system in July of 2000, the engine driven system was valved off, and that the generator driven compressor's rod had broken. In his opinion it broke because oil had not been circulating with the refrigerant, and thus the friction caused it to break. Mr Barney testified and also stated in a letter that the APPARITION's refrigeration system could have been fixed at a lower cost by replacing the compressor, suction accumulator, evaporators and certain other parts, without buying and installing a new system as was done in Pensacola.
Don Clark in Pensacola installed a brand new refrigeration unit at a cost of $10,876.85. Mr. Harkins had paid Mr. Dumstorf about $3,600.00 to repair his refrigeration system. The trial court gave weight to the fact that Mr. Harkins had sought Mr. Dumstorf's expertise in correcting the refrigeration problem once, and if Mr. Dumstorf thought then that this system was irreparable, he should not have attempted to do the job, but rather should have recommended a new unit.
In maritime law, damages are not recoverable for betterment of the thing repaired. Petro United Terminals v. J.O. Odfjell Chem. Carriers, 756 F.Supp. 269 (E.D.La.1991); Freeport Sulphur Co. v. The Hermosa, 526 F.2d 300 (5th Cir.1976). Here, the award of a new refrigeration system is clearly better than the repair of the old one. Mr. Barney testified and listed several components that could have been replaced, that would have returned Mr. Harkins system to its original condition. Using the estimate from Don's Marine Services, the basis for the award of $10,876.85 for the new system, and adding *720 only the essential components based upon that estimate plus the 7.5% Florida sales tax, we arrive at the reduced award of $4,229.00.
UNPAID BILL/SETOFF
On September 9, 2004, Mr. Harkins paid Mayer five thousand ($5,000.00) dollars; later he made a payment of nine thousand dollars ($9,000.00) dollars. Then another invoice was generated, and he paid six thousand. The record reveals there were ongoing negotiations about the bill, and Mr. Harkins testified that Mr. Mayer told him to pay him what he thought was fair. At that point, Mr. Harkins issued a check for around seven thousand ($7,000.00) dollars. Mr. Mayer testified that in all Mr. Harkins paid about twenty-four thousand ($24,000.00) dollars on a thirty-five thousand ($35,000.00) dollar bill, which was less than what the job cost him.
Plaintiff made much of deposition testimony of Mr. Mayer about collecting from Mr. Harkins. Mr. Mayer testified at trial that he did not think it economically justifiable and astute business practice to hire attorneys and incur fees to collect an eleven thousand dollar bill. This does not imply that there was a meeting of the minds that the account was fully paid and satisfied. Moreover, La. C.C. art. 3071, treating Transaction and Compromise, states that such a compromise must be reduced to writing or recited in open court.
The Mayer Work Order Terms and Conditions, paragraph 2, states that "in the event that specific prices are not quoted, it is understood and agreed that all work is to be performed by Mayer Yacht Services usual and customary time and material charge." We have reviewed the checks that Mr. Harkins paid Mayer, and nowhere does it state "full payment" or "in full accord and satisfaction," considering the testimony in the record, we find the trial court was manifestly erroneous to dismiss the reconventional demand. We reverse the trial court on this issue and award Mayer the eleven thousand four hundred thirty-four dollars and twenty seven cents ($11,434.27) with legal interest from the date of judicial demand.
CONCLUSION
Therefore, for the aforementioned reasons, we affirm the trial court's award of $20,119.22 for the paint job, affirm its denial of non-pecuniary damages, affirm the award of $11,392.21 due to the dripless shaft system failure, amend and reduce the award for refrigeration damages to $4,229.00, affirm the award of $1,700.00 for dock fees, affirm the denial of attorneys' fees and costs, affirm the denial of loss of use of vessel and emotional distress and amend the Judgment to award $11,434.27 to the defendant for unpaid bills.
AMENDED AND AFFIRMED AS AMENDED.
MURRAY, J., concurs in the result.
NOTES
[1] The U.S. flagged Document # 918790 S/V APPARITION is a 1986 custom built, fiberglass hull schooner, with an inboard 80 horsepower Ford/Sabre engine, 62 feet in length, 15.4 feet in breadth, and 8 feet in depth.
[2] Mr. Mayer is a 50% owner of Maritime Systems, Inc.
[3] Mr. Harkins had worked in the boat industry before in Tampa, Fl., and owned this yacht for years, thus he is an informed maritime consumer.
[4] Fahey v. Gledhill, 33 Cal.3d 884, 191 Cal. Rptr. 639, 663 P.2d 197 (1983), notes a scholarly distinction between commercial vessels and pleasurecraft, such distinctions have been rejected in federal court precedent.
[5] There was testimony in the record that the painting of this same boat had been accomplished a couple of years prior, and the job cost around $6,000.00, as opposed to this pretrial estimate of $20,119.22.